IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Breanna Berndsen, Kristen Elizabeth Joyce Campbell, Charly Dahlquist, Taylor Flaherty, Ryleigh Houston, Anna Kilponen, Rebekah Kolstad, Sarah LeCavalier, Alyssa MacMillan, Annelise Rice, and Abigail Stanley,<br><br>       Plaintiffs,<br><br>vs.<br><br>North Dakota University System,<br><br>       Defendant. | ) ) ) ) **ORDER GRANTING DEFENDANT'S** ) **MOTION TO DISMISS** ) ) ) ) Case No.: 3:18-cv-125 ) ) ) ) ) ) ) |

Before the Court is the Defendant's "Motion to Dismiss" filed on August 24, 2018. See Doc. No. 10. The Defendant seeks to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On September 24, 2018, the Plaintiffs filed a response in opposition. See Doc. No. 14. On October 15, 2018, the Defendant filed a reply brief. See Doc. No. 15. For the reasons set forth below, the Court grants the Defendant's motion to dismiss.

I.   **BACKGROUND**

In the Spring of 2017, the University of North Dakota ("UND") discontinued the women's ice hockey program, following the team's 2016-2017 season. On June 12, 2018, the Plaintiffs—former members of the hockey team who competed during the 2016-2017 season—sued the North Dakota University System for declaratory and injunctive relief, alleging UND engaged in sex discrimination in violation of Title IX. The complaint provides, in relevant part:

> UND fails to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students, due to, among other things, its elimination of its women's ice hockey program, its improper calculations of bona fide opportunities for female participation in intercollegiate athletics, and its over-reporting of the number of female athletes on teams.

See Doc. No. 1, pp. 21-22. According to the complaint, the Defendant (North Dakota University System) is a state public entity that owns and operates UND, and it receives federal financial assistance.

## II.     STANDARD OF REVIEW

The Defendant moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. "To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint is facially plausible where its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The plaintiff must plead facts that show more than a mere speculation or possibility that the defendant acted unlawfully. Id.; Twombly, 550 U.S. at 555. While the court accepts the complaint's factual allegations as true, it is not required to accept the plaintiff's legal conclusions or a "formulaic recitation of the elements of a cause of action." Iqbal, 556 U.S. at 678. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. The court's assessment of whether the complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

In *Twombly* the Supreme Court dismissed the complaint because it lacked sufficient factual allegations to support the claims:

> Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another." 550 U.S. at 551 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. Ibid. (internal quotation marks omitted).
>
> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. Id. at 555. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." Id. at 565-566. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. Id. at 567. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. Id. at 570.

Iqbal, 556 U.S. at 679-680.

### III.    LEGAL DISCUSSION

In its motion to dismiss, the Defendant argues the Plaintiffs have failed to allege a violation of Title IX. Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Pursuant to the

3

statute, the Department of Health, Education, and Welfare ("HEW")–which has since split into two departments, the Department of Education, and the Department of Health and Human Services ("HHS")–promulgated regulations implementing the statute. Those regulations provide, in part:

> (a) *General*. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
>
> . . .
>
> (c) *Equal opportunity*. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
>> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>>
>> . . . .

34 C.F.R. § 106.41 (2018) (Department of Education regulations) (emphasis added); see also 45 C.F.R. § 86.41 (2018) (identical HHS regulations).

In 1979, HEW published a policy interpretation of the regulations, in part, "to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs." 44 Fed. Reg. 71413 (1979). The policy interpretation contained, among other items, standards for determining whether an educational institution has "effectively accommodate[d] the interests and abilities of members of both sexes" under Section 106.41(c)(1):

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

4

> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71418 (1979). This three-part test has been adopted by the Eighth Circuit, see Chalenor v. Univ. of North Dakota, 291 F.3d 1042, 1045 (8th Cir. 2002), and universally by courts across the United States. See, e.g., Cohen v. Brown Univ., 101 F.3d 155, 173 (1st Cir. 1996); Biediger v. Quinnipiac Univ., 691 F.3d 85, 92-93 (2d Cir. 2012); Roberts v. Colorado State Bd. of Agriculture, 998 F.2d 824, 828-29 (10th Cir. 1993).

> [T]he three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, [the Department's Office for Civil Rights] will determine that the institution is meeting this requirement.

Chalenor, 291 F.3d at 1045-46 (alteration in original) (quoting Department of Education, Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996)).

Compliance with Part One of the Three-Part Test "affords an institution a safe harbor for establishing that it provides nondiscriminatory participation opportunities." Id. at 1046 (internal quotes omitted). To survive a 12(b)(6) motion, the Plaintiffs must adequately allege that UND has not provided participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments. See Beasley v. Alabama State Univ., 966 F.Supp. 1117,

5

1124-25 (M.D. Ala. 1997); Equity in Athletics, Inc. v. Department of Educ., 675 F.Supp.2d 660, 683 (W.D. Va. 2009).

> The Plaintiffs alleged:
>
> UND fails to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students, due to, among other things, its elimination of its women's ice hockey program, its improper calculations of bona fide opportunities for female participation in intercollegiate athletics, and its over-reporting of the number of female athletes on teams.

See Doc. No. 1, pp. 21-22. These are the Plaintiffs' only allegations that UND failed to provide participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments. The allegations start with a legal conclusion: "UND fails to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students." The Court rejects legal conclusions or "formulaic recitation[s] of the elements of a cause of action." Iqbal, 556 U.S. at 678. Thus, this legal conclusion is not entitled to the presumption of truth. Further, the factual bases the Plaintiffs provide do not plausibly suggest a substantial disproportionality among male and female athletic opportunities.

The Plaintiffs' first factual basis for disproportionate opportunities is the elimination of the women's ice hockey program. The assumption that eliminating an athletic program, such as the women's hockey program, leads to disproportionate opportunities is misguided. An institution's elimination of an athletic program is consistent with both falling out of compliance with Part One (failing to provide substantially proportionate opportunities) and maintaining compliance with Part One (providing substantially proportionate opportunities). See Roberts, 998 F.2d at 830 ("Financially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population."); Kelley v. Board of Trustees, 35 F.3d 265, 269-272 (7th Cir. 1994)

(holding the University's decision to eliminate the men's swimming program, while retaining the women's swimming program, did not violate Title IX). Absent additional information, such as the ratio of male to female students enrolled at UND and the ratio of male to female athletes after eliminating the women's hockey program, either outcome—falling out of compliance or maintaining compliance—is possible.

In *Twombly*, the Supreme Court concluded that the telecommunication providers' parallel conduct was consist with both unlawful agreement and lawful, unchoreographed free-market behavior. Iqbal, 556 U.S. at 680 (citing Twombly, 550 U.S. at 567). "Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed." Id. (citing Twombly, 550 U.S. at 570). Likewise, because elimination of the women's ice hockey program, on its own, does not tend to prove one way or the other whether UND provided substantially proportionate athletic opportunities between the genders, this factual basis fails to aid in adequately alleging UND's failure to meet Part One.

The Plaintiffs also alleged that UND failed to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students due to "its improper calculations of bona fide opportunities for female participation in intercollegiate athletics, and its over-reporting of the number of female athletes on teams." This allegation is purely speculative. The Plaintiffs have not alleged what UND's calculations are regarding athletic opportunities, how UND is improperly calculating opportunities for women, how UND is over-reporting the number of female athletes on teams, what the "correct" calculations are, and what process the Plaintiffs have used in obtaining the "correct" calculations. Without any further facts to support this allegation, the Plaintiffs have failed to assert a right to relief above the speculative level. See Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above

7

the speculative level"); Iqbal, 556 U.S. at 678 (stating a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"); see also Twombly, 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). Because the Plaintiffs have the burden to adequately allege that UND did not comply with Part One of the Three-Part Test, and have not done so, they have failed to state a claim upon which relief may be granted.

The Plaintiffs argue that UND has violated several other requirements of Title IX requiring the Court to look beyond the Three-Part Test. The Court disagrees. First, the Plaintiffs argue UND failed to provide equal treatment to their female athletes. The "equal treatment" standard of Title IX is derived from 34 C.F.R. § 106.41(c)(2)-(10). Mansourian v. Regents of Univ. of California, 602 F.3d 957, 964 (9th Cir. 2010). While effective accommodation claims (Section 106.41(c)(1)) concern the opportunity to participate in athletics, equal treatment claims "allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." Id. at 965; see also 34 C.F.R. § 106.41(c)(2)-(10). The Plaintiffs have made no such allegations in their complaint. Thus, the Court need not address this issue.

Second, the Plaintiffs argue UND has violated the "Contact Sports" language of the 1979 Policy Interpretation, which provides:

> [I]f an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex under the following circumstances:
>
> > (1) The opportunities for members of the excluded sex have historically been limited; and
>
> > (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.

8

44 Fed. Reg. 71418.  The Plaintiffs have not cited to any authority adopting this standard.  The courts have universally relied on the Three-Part Test in determining whether an educational institution has effectively accommodated the interests and abilities of both sexes.  Additionally, the "Contact Sports" provision of the Policy Interpretation is inconsistent with the regulating statute, which provides:

> a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.  However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.  For the purposes of this part, contact sports include . . . ice hockey . . . .

34 C.F.R. § 106.41(b).  Accordingly, the Court rejects the "Contact Sports" standard outlined in the Policy Interpretation as suggested by the Plaintiffs.  See Auer v. Robbins, 519 U.S. 452, 461 (1997) (stating an interpretation of a regulation controls, unless plainly erroneous or inconsistent with the regulation).

Third, the Plaintiffs argue UND has violated Section VII.C.3. of the Policy Interpretation, which provides:

> Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:
>
> (a) The processes take into account the nationally increasing levels of women's interests and abilities;
>
> (b) The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;
>
> (c) The methods of determining ability take into account team performance records; and
>
> (d) The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

44 Fed. Reg. 71417.  The Plaintiffs do not cite any authority that has found a Title IX violation based on these factors alone.  Instead, these factors are more appropriately utilized under Part Three of the Three-Part Test to demonstrate that the interests and abilities of the underrepresented sex have been fully and effectively accommodated by the present program.  See, e.g., Roberts, 998 F.2d at 831-32.  Because the Plaintiffs have not adequately alleged a disproportionality under Part One, we need not reach Part Three.

### IV.      REQUEST TO AMEND COMPLAINT

In their response to the Defendant's motion to dismiss, the Plaintiffs request the Court grant them leave to file an amended complaint if the Court determines the motion to dismiss is meritorious.  Rule 15(a) of the Federal Rules of Civil Procedure states that a party can amend a pleading with the Court's leave, and that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  There is no absolute right to amend.  Backer v. Univ. of Neb. at Omaha, 191 F.3d 904, 908 (8th Cir. 1999).  It is generally left to the sound discretion of the court whether to grant leave to file an amended complaint, and unless there is a good reason for denial, such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment, leave to amend is generally granted.  Id. at 907-08; see also Frey v. City of Herculaneum, 44 F.3d 667, 672 (8th Cir. 1995) (stating leave to amend should be granted where the plaintiff demonstrates it can cure a lack of specificity); Mangan v. Weinberger, 848 F.2d 909, 911 (8th Cir. 1988) (finding dismissal with prejudice is only appropriate after affording an opportunity to file an amended complaint).

The issue of whether to grant leave to amend the complaint has not been briefed by the parties.  The Plaintiffs did not submit for the Court's review a proposed amended complaint, nor have they

demonstrated an amended complaint would cure the deficiencies enumerated above. See <u>Soueidan v. St. Louis Univ.</u>, No. 18-2124, 2019 WL 2478047, at *6 (8th Cir. June 14, 2019) (holding the district court did not abuse its discretion in denying doctoral student leave to amend his complaint when he did not submit a proposed amendment to the district court, nor include anything in his brief in opposition to the motion to dismiss to indicate what an amended complaint would have contained). Further, the Plaintiffs have had ample time to amend their complaint either as a matter of course or with leave of the Court. <u>See</u> Fed. R. Civ. P. 15(a).  It is not until now, in the final sentence of their response in opposition to the Defendant's motion to dismiss, the Plaintiffs request, alternatively, an opportunity to amend the complaint.  In the broad exercise of its discretion, the Court declines the Plaintiffs' request to amend the complaint.

### V.     **CONCLUSION**

The Court has carefully reviewed the entire record, the parties' filings, and the relevant law. For the reasons set forth above, the Defendant's motion to dismiss (Doc. No. 10) is **GRANTED**.  The complaint is **DISMISSED WITHOUT PREJUDICE**.  The Court **FINDS AS MOOT** the Plaintiffs' motion for oral argument (Doc. No. 16).

**IT IS SO ORDERED**.

Dated this 19th day of June, 2019.

                                                  */s/ Daniel L. Hovland*
                                                  Daniel L. Hovland, Chief Judge
                                                  United States District Court